BUTLER BALANCING COMPANY,
INC., Petitioner,

v.

DEPARTMENT OF LABOR & INDUS-
TRY, PREVAILING WAGE APPEALS
BOARD, Respondents.

Commonwealth Court of Pennsylvania.

Argued June 6, 2001.
Decided July 18, 2001.

David S. Makara, Spring House, for pe-
titioner.

Bruce E. Endy, Philadelphia, for inter-
venor, Sheet Metal Workers International
Assoc. Local #19.

Before FRIEDMAN, Judge,
FLAHERTY, Senior Judge and
RODGERS, Senior Judge.

FRIEDMAN, Judge.

Butler Balancing Company, Inc. (Butler)
appeals from an October 3, 2000 order of
the Department of Labor and Industry,
Prevailing Wage Appeals Board (PWAB)
granting the exceptions of Intervenor
Sheet Metal Workers International Associ-
ation Local No. 19 (Union) to the Hearing

Examiner's Proposed Report and sustaining the Union's grievance.

The grievance at issue here arises out of work done in autumn 1992/winter 1993 on a new Chester County Government Services Center (Project). The Project itself was a "public work" subject to the Prevailing Wage Act (PWA).[1] On October 24, 1991, the County of Chester (County) entered into a "Trade Contract" with the Farfield Company (Farfield), retaining Farfield to perform the Project's mechanical work, which included installation of the heating, ventilating and air conditioning (environmental or HVAC) systems. (*See* Stipulation of Facts, Nos. 1, 3.) In turn, on November 12, 1991, the mechanical contractor, Farfield, engaged Butler,[2] a corporation in the business of testing and balancing air and water systems, as a subcontractor to perform testing, adjusting and balancing work (TAB work) for the HVAC systems at the Project. (*See* Stipulation of Facts, Nos. 12, 33.) The specifications for the Project's TAB work were similar to those found in bid and construction documents for most new buildings. (*See* Stipulation of Facts, No. 23.) Pursuant to the subcontract, Butler intermittently engaged in onsite work at the Project between September of 1992 and April of 1994, doing TAB work for approximately twenty-six air-handling and exhaust systems that had been installed by Farfield and other subcontractors. (Stipulation of Facts, Nos. 34, 36.) TAB work on HVAC systems is an integral part of the construction of a new office building such as the Project; in fact, buildings are not turned over to the owners for occupancy until the testing, adjusting and balancing of the building's environmental systems are complete and their proper operation assured. (*See* Stipulation of Facts, Nos. 23, 25.)

At the time Butler entered into the subcontract with Farfield, Butler had a collective bargaining agreement (CBA) with the Union, in which TAB work was identified as sheet metal work under the Union's jurisdiction. The only Butler employees on the Project were David Butler, listed on the payroll reports as a journeyman, and two other workers, both listed as apprentices; none of the three is certified as a TAB technician.[3] (*See* Stipulation of Facts, Nos. 21–22.) Donald Butler, the TAB Supervisor for Butler, was certified by the Associated Air Balance Council (AABC).[4] He was the only one from Butler able to certify that the TAB work on the HVAC systems was performed in accordance with job specifications, and he tried to come to the job site monthly to oversee the operation. (*See* Stipulation of Facts, No. 20.)

On August 18, 1993, County Controller, Joseph Carpenter, wrote to Butler asking why David Butler was not receiving the rate of pay for a journeyman under the

1. Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. §§ 165–1—165–17.

2. Although Farfield actually subcontracted with the Butler Company, the work on the Project was done by, and payment made to, Butler Balancing Company, Inc. (Stipulation of Facts, No. 15.) For purposes of this opinion, the two will be treated as the same entity.

3. The workmen who do the testing, adjusting and balancing at any construction site generally are called TAB technicians, although it is not necessary for all the workmen doing TAB work to be certified. (Stipulation of Facts, No. 18.)

4. The Trade Contract between Farfield and the County required Farfield to obtain the services of an independent organization to do the TAB work on the Project, that is, an organization that would comply with the applicable procedures and standards of either the AABC or the National Environmental Balancing Bureau (NEBB). (R.R. at 478a–79a.)

PWA and seeking documentation on whether Butler registered the apprentices in an approved apprentice program. Butler responded stating its belief that its employees doing TAB work at the Project were not subject to the PWA. (*See* Stipulation of Facts, Nos. 28–29.) On December 21, 1993, John T. Kupchinsky, Deputy Chief Counsel of the Department of Labor and Industry (Department), wrote to Donald Butler requesting information about the work performed by Butler at the Project. Based on Donald Butler's replies, Richard Lengler, Assistant Counsel to the Department, issued a determination on January 26, 1994, concluding that the work performed by Butler was not "construction, reconstruction, demolition, alteration and/or repair work" to which the PWA applied but, rather, was "service-type" work outside the scope of the PWA. (*See* Stipulation of Facts, Nos. 30–32; R.R. at 641a.)

The Union filed a grievance from that opinion on February 9, 1994, (R.R. at 690a–92a), and the case was referred to a Hearing Examiner. At the hearing, held on April 28, 1998, the Union took the position that TAB work was sheet metal work covered by the PWA. To support its position, the Union submitted various witnesses who testified about TAB work in general or TAB work performed pursuant to other contracts; none of the Union's witnesses had direct knowledge of the work completed by Butler on the Project. For its part, Butler relied upon the depositions of David and Donald Butler regarding the work actually performed by Butler on the Project to support the position that such work was outside the scope of the PWA's coverage.

On March 11, 1999, the Hearing Examiner issued a Proposed Report denying the Union's grievance based on the Union's failure to present evidence sufficient to rebut Butler's testimony.[5] The Hearing Examiner ultimately concluded that, despite presenting "a great deal of evidence to show the extensive nature of the TAB work performed by sheet metal workers generally," (Proposed Report at 6), the Union could not meet its burden to show that the TAB work actually performed by Butler on the Project constituted "public work" covered by the PWA,[6] i.e., "construction, reconstruction, demolition, alteration and/or repair work" done on a public project. Although conceding that Butler may be "*contractually* obligated to pay the prevailing wage," (Proposed Report at 8) (emphasis added), the Hearing Examiner held that Butler's "TAB technicians were not *statutorily* entitled to be paid prevailing wages." (Hearing Examiner's Conclu-

---

5. In addition to the facts stipulated to by the parties before the hearing, the Hearing Examiner made nine other findings. With respect to the work performed by Butler on the Project, the Hearing Examiner found that Butler made no mechanical changes to the HVAC systems but merely took readings and, where balancing was needed, simply turned knobs or pushed buttons to make needed adjustments. The work completed by Butler then was compiled in a report and submitted to Farfield, and when Butler indicated that mechanical adjustments were required, Farfield made them. (Hearing Examiner's Findings of Fact, Nos. 38–40, 43–44.) In fact, the Hearing Examiner found that Donald Butler was a member of the AABC, under whose standards Butler was not permitted to make mechanical changes to an HVAC system. (Hearing Examiner's Findings of Fact, Nos. 41–42.) Finally, the Hearing Examiner found that TAB work need not be performed by a sheet metal worker and that the PWA contained no classification for an air or water balancer. (Hearing Examiner's Findings of Fact, Nos. 45–46.)

6. In a grievance arising from the administration of the PWA, the grievant bears the burden of proof. 34 Pa.Code § 213.8(j).

sions of Law, Nos. 1–2, 4) (emphasis added).

The Union filed exceptions to the Proposed Report with the PWAB, and both Butler and the Department's Bureau of Labor Law Compliance filed responses. On October 3, 2000, the PWAB granted the Union's exceptions and sustained the Union's grievance. Based on the general descriptions of TAB work and the definition of "workmen" entitled to PWA protection on public work sites, the PWAB concluded that (1) TAB work is "public work" within the meaning of the PWA, and, (2) in this case, Butler performed TAB work subject to the PWA under the sheet metal workers' classification. Butler now seeks to have this court reverse the PWAB decision and deny the Union's grievance.[7]

The issue on appeal then is whether the TAB work performed by Butler employees at the Project was public work covered by the PWA under the classification for a sheet metal worker, requiring Butler to pay those employees the prevailing wage for that craft.

■ The purpose of the PWA is to protect workmen employed on public projects from substandard pay by ensuring that they receive the prevailing minimum wage. *Kulzer Roofing, Inc. v. Department of Labor and Industry,* 68 Pa.Cmwlth. 642, 450 A.2d 259 (1982). To that end, section 5 of the PWA provides that "Not less than the prevailing minimum wages as determined hereunder shall be paid to all *workmen* employed on *public work.*" 43 P.S. § 165–5 (emphasis added). "Public work" is defined in section 2(5) of the PWA as:

> construction, reconstruction, demolition, alteration and/or repair work other than maintenance work,[8] done under contract [9] and paid for in whole or in part

---

7. On appeal from a decision of the PWAB, our scope of review is limited to determining whether constitutional rights were violated, whether the PWAB committed an error of law and whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704; *Pennsylvania State Building and Construction Trades Council, AFL–CIO v. Prevailing Wage Appeals Board,* 722 A.2d 1139 (Pa.Cmwlth.1999.)

8. Section 2(3) of the PWA defines "maintenance work" as the "repair of *existing* facilities when the size, type or extent of such facilities is not thereby changed or increased." 43 P.S. § 165–2(3) (emphasis added). We agree with the PWAB that TAB work on new construction, whether speaking in general terms or in reference to the actual TAB work performed by Butler on the Project, is not "maintenance work" outside the PWA's coverage. Maintenance work refers to the repair of *existing* facilities, that is, facilities that, at some point, were operating properly but have now failed to do so. Thus, in *Kulzer,* we noted that "maintenance work" would occur when a facility, once in usable condition, was restored to that condition by being "overhauled or patched." *Id.* at 648,

450 A.2d 259. Because both the Project and the HVAC system still were incomplete and unused when the TAB work here was performed, this TAB work could not be considered as "maintenance work" outside the scope of the PWA. However, this fact alone does not necessarily answer the question of whether the TAB work, in fact, falls within the PWA's coverage.

9. Section 3 of the PWA requires that "[t]he specifications for every contract for any public work to which any public body is a party, shall contain a provision stating the minimum wage rate that must be paid to the workmen employed in the performance of the contract." 43 P.S. § 165–3. Exhibit H to the County/Farfield Trade Contract identifies prevailing wage determinations with respect to each type of work performed under the Trade Contract. Under the HVAC wage determination, sheet metal worker rates are listed at $32.16 per hour, with apprentice rates ranging from forty-five percent to eighty-five percent of journeymen rates. (*See* Stipulation of Facts, No. 10.) In addition, Attachment A to the subcontract between Butler and Farfield requires Butler to provide all labor, materials, equipment and services necessary to complete

out of the funds of a public body where the estimated cost of the total project is in excess of twenty-five thousand dollars ($25,000), but shall not include work performed under a rehabilitation or manpower training program.

43 P.S. § 165–2(5) (emphasis added).

According to the description of TAB work stipulated to by the parties, TAB work requires testing and regulation of the flow of fluids, air or water in the HVAC system installed by the mechanical contractor. For example, every HVAC system that pushes air through a system of ducts requires fans at various places to push air through the system in sufficient quantities and at sufficient pressure to ensure that all parts of the building receive proper air flow. A TAB technician may, as needed, go to each fan and remove the housing and safety guards from the motor, measure the fan's output, and then adjust the fan speed so that the fan will move the correct amount of air. Adjustment of fan speed generally means taking a wrench and adjusting the pulleys or sheaves that run the fan belts from the motor to the fan and then further adjusting the alignment of the pulleys. They must use, in addition to measuring devices, wrenches of various types to open motor and fan housings, remove fan guards, adjust fan sheaves and to adjust some types of dampers and terminal devices. In addition to measuring and recording fan speed, the TAB technician must make certain that every fan is adjusted to deliver the correct air to the system. Similarly, the TAB technician must measure air flow within the duct work of the building, sometimes requiring drilling holes into the ducts in measured locations and then recording the results. If this method is used, the holes must be plugged or capped after measurements are complete. After initial readings are recorded, the TAB technician must adjust the air flow at terminal devices, remeasure the air flow and record the results. (*See* Stipulation of Facts, Nos. 18–19.) [10]

■ After considering this description of TAB work, the PWAB correctly observed that the work performed by a TAB technician does not fall neatly into the definition of "public work" as defined by the PWA because it is not easily envisioned as "construction," "alteration" or "repair work" in the traditional senses. (PWAB op. at 4.) However, we agree with the PWAB's ultimate conclusion that the PWA encompasses TAB work.

As indicated, the legislature enacted the PWA to protect "workmen" on public work sites, such as the Project here. Identifying those individuals intended to benefit from this statutory protection, section 2(7) of the PWA defines the term "workman" to include:

laborer, mechanic, skilled and semi-skilled laborer and apprentices employed by any contractor or subcontractor and engaged in the performance of services directly upon the public project, regardless of whether their work becomes a component part thereof, but does not include material suppliers or their employes who do not perform services at the job site.

43 P.S. § 165–2(7) (footnote omitted).

This definition includes all mechanics or skilled laborers who perform work directly upon the public work project and excludes

---

TAB work on the HVAC systems as required by the Trade Contract. The subcontract also had prevailing wage rates attached for purposes of payroll reports. (*See* Stipulation of Facts, No. 13.)

**10.** Other than unscrewing and replacing access panels, Butler employees did not engage in the removal or replacement of system components. (Stipulation of Facts, No. 37.)

only a very narrow group of individuals, specifically, those who supply materials to, but do not perform services at, the job site. Based on this definition and on the description of TAB work, which is performed by skilled laborers directly upon the Project, the PWAB found that TAB work on public projects is "public work" under the PWA. We cannot fault this reasoning, particularly in light of decisions recognizing the PWA to be a remedial statute that should be interpreted broadly to apply coverage. *See DiLucente Corp. v. Pennsylvania Prevailing Wage Appeals Board,* 692 A.2d 295 (Pa.Cmwlth.1997).

Butler, however, focuses on the narrowly framed issue here and contends that there is no basis for the PWAB's decision upholding the Union's grievance in this particular case. To the contrary, Butler asserts that, based on the record, the PWAB decision is against the clear weight of the evidence. In this regard, Butler

notes that it offered first-hand evidence as to what actually occurred at the Project to demonstrate that Butler did not perform any work within the scope of the PWA,[11] whereas the Union relied on descriptions of TAB work in general, or as performed on unrelated construction projects, to support the contrary position. Butler claims that the PWAB improperly focused on the generalities presented by the Union while ignoring Butler's conflicting evidence as to what it actually did at the Project.[12] In a related argument, Butler also challenges the Union's reliance on the County/Farfield Trade Contract and the Farfield/Butler subcontract with respect to the duties performed by Butler employees on the Project. Butler maintains that the PWAB should not have given any relevance to these contracts, noting the Hearing Examiner's admonition that "a contractor's obligation to pay the prevailing wages is rooted in statute and not necessarily in

11. Specifically, Butler presented testimony that it was Farfield, not Butler, that constructed and performed all mechanical adjustments to the HVAC systems and that, in fact, Butler was precluded from doing such work under AABC standards. According to Butler, the tools it used were nothing more than testing devices to take readings and measurements; they were not used in the construction, demolition, alteration or repair of the Project's HVAC systems. Instead, Butler would generate a report for Farfield based on testing results, and Farfield would perform any mechanical adjustments recommended by Butler in the reports. In addition to this testing, Butler also performed balancing work by making adjustments without the use of any tools, merely by turning a knob, pushing a button or through the computer system. If defective components required replacements, Farfield was called upon to do it.

However, according to the Union, Butler has provided misleading information in describing the nature of the work involved. In this regard, the Union challenges Butler's claim that AABC specifications precluded Butler employees from performing mechanical adjustments to the Project's HVAC sys-

tems. The Union presents a list of AABC specifications to illustrate that TAB work under the AABC standards involves more than mere testing; rather, adjusting and balancing are at the heart of a TAB technician's duties. (*See* Union's brief at 28–29.) Further, the Union points out that the AABC specifications specifically require the owner to allot sufficient funds in a project cost estimate for the testing and balancing phases of construction, thereby tying TAB work directly to a project's construction costs and specifications.

12. Butler makes the argument that, by taking this approach, the PWAB essentially reversed the burden of proof in this case. Butler claims that, whereas the Hearing Examiner properly required the Union to establish that Butler's TAB work on the Project fell within the PWA coverage, the PWAB erred by forcing Butler to establish that the TAB work it performed on the Project was not covered by the PWA. We cannot accept this argument. Where, as here, the evidence presented establishes that TAB work is within the scope of the PWA *as a matter of law*, it is not error to require that Butler assume the burden of proving facts that take it outside the norm.

contract." (Proposed Report at 8.) We are unpersuaded by Butler's arguments.

Here, the Union clearly presented considerable evidence to support the contention that TAB work on HVAC systems, generically, when performed on public projects, is "public work" within the meaning of the PWA. Indeed, the parties agree that TAB work on HVAC systems is an integral part of building construction and necessary for project completion. Moreover, although no Union witnesses could testify from personal experience regarding the activities performed by Butler at the Project, the Union, through the relevant contracts, provided evidence that Butler's TAB work on the Project's HVAC systems also constituted "public work" subject to the PWA. Both the County/Farfield Trade Contract and the Farfield/Butler subcontract[13] provided that prevailing wages would be paid to employees working on the Project, and because Butler performed the TAB work on the Project's HVAC systems as part of these mechanical contracts, Butler's TAB work, by definition, was part of the mechanical work done on the Project. As the PWAB stated, "these agreements indicate that Butler (or Farfield, eventually through its subcontractor Butler) was to perform TAB work at the Center Project. The testimony presented by Butler[, although understating its role in performing TAB work,] did not indicate that they undertook wholly different duties than what was called for under these agreements." (PWAB op. at 8.) Consequently, based on the record here, the PWAB did not err in concluding that Butler performed TAB work covered by the PWA.

■ Finally, Butler contends that the PWAB improperly categorizes a TAB technician as a sheet metal worker, pointing out that: (1) the PWA makes no provision for a classification for TAB technicians; (2) a worker need not be a sheet metal worker to perform TAB work; and (3) a TAB technician's work is not necessarily the work of a sheet metal worker; in fact, steam fitters also claim jurisdiction over work performed by TAB technicians. Although each of Butler's points is correct, this does not alter the fact that the Union has produced evidence sufficient to support the PWAB's determination that Butler's work on the Project was TAB work subject to PWA requirements for sheet metal workers,[14] and Butler cannot use this argument to avoid paying the prevailing wage rate to its employees. We are persuaded by the PWAB's reasoning in this regard.

Taken to its ultimate conclusion, though, Butler's argument is that because different types of personnel could perform TAB work, including members of various craft unions, one cannot readily determine under whose trade jurisdiction TAB work should fall: therefore, because of this uncertainty, Prevailing Wage mandates do not apply at all. Given [that the PWAB] holds that TAB work is Prevailing Wage work .... it

---

**13.** Although we recognize that the PWAB could not rule on a claim by the Union based solely on these contracts, we agree with the PWAB that the County/Farfield Trade Contract and the Farfield/Butler subcontract are extremely relevant with regard to the question of the work performed by Butler on the Project.

**14.** Specifically, the Union demonstrated that sheet metal workers acquire the special skills needed to perform TAB work through apprentice and journeymen programs established in the sheet metal industry and that TAB work is included as sheet metal work in collective bargaining agreements negotiated with various sheet metal workers' unions in Pennsylvania. Moreover, in this particular case, Butler had a CBA with the Union covering this category of workmen.

appears that (at least in this instance), TAB work is performed by sheet metal workers.

PWAB op. at 7.

Accordingly, we affirm.

## ORDER

AND NOW, this 18th day of July, 2001, the order of the Department of Labor and Industry, Prevailing Wage Appeals Board, dated October 3, 2000, is hereby affirmed.