**MUNICIPALITY OF BETHEL PARK, Petitioner**

v.

**PENNSYLVANIA PREVAILING WAGE APPEALS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 14, 2009.

Decided Nov. 18, 2009.

---

Robert L. McTiernan, Pittsburgh, for petitioner.

Jennifer L. Berrier, Asst. Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, PELLEGRINI, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge PELLEGRINI.

Section 5 of the Pennsylvania Prevailing Wage Act (Prevailing Wage Act),[1] 43 P.S. § 165–5, requires that "[n]ot less than the prevailing minimum wages . . . be paid to all workmen employed on a public work." This appeal involves whether a contract entered into by the Municipality of Bethel Park (Bethel Park) involving certain work on its sewer system was "public work" requiring payment of prevailing wages subject to the Prevailing Wage Act.

The term "public work" is defined in Section 2(5) of the Prevailing Wage Act, 43 P.S. § 165–2(5), as:

[C]onstruction, reconstruction, demolition, alteration and/or *repair work other than maintenance work,* done under contract and paid for in whole or in part out of the funds of a public body where the estimated cost of the total project is *in excess of twenty-five thousand dollars ($25,000),* but shall not include work performed under a rehabilitation or manpower training program.

Under this definition, prevailing wages do not apply where the total project is not in excess of $25,000 or is "maintenance work," which does not have a dollar limitation. The Prevailing Wage Act defines "maintenance work" as "the repair of existing facilities when the size, type or extent of such facilities is not thereby changed or increased." Section 2(3) of the Prevailing Wage Act, 43 P.S. § 165–2(3). Our Supreme Court in *Borough of Youngwood v. Pennsylvania Prevailing Wage Appeals Board,* 596 Pa. 603, 617, 947 A.2d 724, 732–733 (2008), stated that what work was excluded from coverage of prevailing wages must be narrowly construed:

[B]ecause the Act provides that "public work" includes "repair" and that the exception to "public work" (i.e., "mainte-

nance work") includes "repair" of a specific type, it logically follows that the General Assembly intended that "maintenance work" be considered a lesser or minor form of "repair." Therefore, we hold that in construing the Act, the focus must fall principally on the Act's clear mandate that prevailing wages are to be paid to workers on public works projects that meet the criteria of 43 P.S. § 165–2(5), taking into consideration that "maintenance work" is an exception to this mandate and must be narrowly construed. The linguistic construction of "maintenance work," in turn, must recognize that the Act defines "maintenance work" as a subset of "repair," and must be accordingly viewed in this narrow manner.

■ We have explained that "maintenance work" is "the repair of existing facilities, that is, facilities that at some point were operating properly but have now failed to do so." *Butler Balancing Co. v. Prevailing Wage Appeals Board,* 780 A.2d 840, 843 (Pa.Cmwlth.2001). Bethel Park contends that all the work performed under its contract was maintenance work and not subject to prevailing wages.

The work that is the subject of this dispute involves a contract bid by Bethel Park in early 2007 for what is known in the industry as a "fix and find" contract. The proposal for bids described the proposed scope of the work as follows:

The Municipality of Bethel Park (Municipality) finds that many times a need arises for small construction or associated service, to address damaged sewer lines, manhole deficiencies or problems associated with sewer systems, in general, whereby the intent of this Proposal is to award a Blanket Contract . . .

---

1. Act of August 15, 1961, P.L. 987, *as amended.*

The purpose of the contract was to provide Bethel Park with a single contractor to work on the municipality's sanitary and storm sewer systems on an "as-needed" basis. The contractor was required to respond to the request for services within 24 hours. The amount paid on each job was based on labor and materials used on each job. The solicitation stated that the contract was not subject to the Prevailing Wage Act. The proposed contract did not guarantee any work because it was on an "as-needed" basis, but the total estimated contract value for work to be performed under the one-year contract was $300,000.

On March 1, 2007, the contract was awarded to the lowest bidder, B. Pepenella Company (Pepenella). Pepenella and Bethel Park executed the contract on May 1, 2007, and Bethel Park had the option to renew the contract for two additional one-year terms.[2] Pepenella began providing maintenance services under the contract in July 2007, which primarily consisted of spot repairs at various locations on the sanitary and storm systems in Bethel Park.

In August 2007, the Department of Labor and Industry's Bureau of Labor Law Compliance (Bureau) requested that Bethel Park provide it with a copy of the contract as well as a description of the work and locations where the work was to be performed. Bethel Park sent the Bureau a copy of the contract along with information about current work orders and explained that based on repair and maintenance work performed at 90 sites in 2006 and 2007 under the previous contract, the average cost of a typical repair was $8,769 and it expected repairs to remain at or near this level through the life of the current contract.

Not accepting that explanation, the Bureau advised Bethel Park that all workers had to be paid the prevailing minimum wage determined by the Bureau. While acknowledging that some of the work was for maintenance work, it contended that the contract could not be divided into separate maintenance and non-maintenance projects under the Prevailing Wage Act. "All of the repair and maintenance tasks to be performed under the Sewer Blanket contract were bid out once under this one contract and awarded to one contractor. Work is planned for and takes place throughout the contract's term. All of the work, regardless of when it is performed, is part of one project under one contract." (Reproduced Record at 10a.)

Bethel Park filed a notice of grievance on February 13, 2008, and the Bureau and Bethel Park filed a joint stipulation of facts on June 8, 2008. The parties requested an evidentiary hearing before the Pennsylvania Prevailing Wage Appeals Board (Board).

Before the Board, Michael D. Smith (Smith), an environmental engineer in Bethel Park's employ, testified that his primary duties were to maintain the sanitary sewer system which was approximately 191 lineal miles. The storm sewer system was approximately 117 miles long. He explained that the contract's primary use was for the first line of defense in emergency situations such as when raw sewage got into someone's basement or was discharged into a creek, but the contract was on an "as-needed" basis. When asked what "as-needed" meant, he stated:

> As-needed meaning finding and fix. If you need it, meaning if an emergency arises and we need to be out there and

2. The contract was terminated April 30, 2009, after which date Bethel Park elected not to exercise its option for a third year.

fix it, or if we find a category five or backup is imminent, we need to get out and fix it. As-needed to maintain and operate the system.

(Reproduced Record at 569a.)

Smith testified that while Bethel Park could have hired an individual contractor for each of the 70 individual "projects," such a process required going before the municipality's council for contract approval after the municipality put out a bid and obtained three bids. If a sewer pipe broke and raw sewage was flowing into a resident's home or into a common area or if a creek overflowed, waiting until a contractor was obtained would obviously not allow Bethel Park to correct that dangerous condition. Smith testified that the purpose of having an on-call contractor for emergencies was exactly for these types of projects.

He then explained that there were different categories of defects that needed to be repaired with category five being the most severe. A category five defect occurred when soil was visible and there was a 35, 40 or 100% collapse, and there would be a lot of debris in the pipe. Category four meant the pipe was in failure mode with the sides pushing in with full collapse imminent.

Smith stated that the majority of the work performed or 70% had been spot repairs, which involved replacing a section of the pipe where it was determined to be defective upon inspection and replacing it with new polyvinyl chloride pipe (PVC) because existing pipe was vitrified clay pipe which was used in sewer installation in the 1950s but was very brittle. Regarding the other types of projects performed under the contract, he stated that they included manhole-to-manhole replacement (approximately 5.80% of the projects) which involved replacing an entire section of pipe between two manholes with PVC (up to 243 lineal feet of old vitrified clay pipe was replaced), but that was a rare situation. (Reproduced Record at 548a.) The manholes were four or five feet in diameter and made of pre-cast concrete. (Reproduced Record at 605a–606a.) However, most recently, one manhole-to-manhole replacement had occurred that had a large number of category fives where an eight-foot section had fully collapsed due to sewage that was just percolating right into the ground. (Reproduced Record at 549a.) In another situation, sewage was actually coming out of the sanitary sewer. (Reproduced Record at 550a.) In both cases, he stated that the jobs would not have been able to be bid out due to the time factor of correcting the problems.

Smith also described lamphole-to-manhole replacement (approximately 17.39%) which involved replacing a broken lamphole with a manhole. He stated that a lamphole was a 90–degree vitrified clay pipe that was six or eight inches in diameter and used in the 1950s that went from the sewer pipe up to the surface with a cover on the end that could be removed so a worker could shine a light down into the sewer to check for problems. (Reproduced Record at 605a.) While lampholes were used in the 1950s through the 1970s, after 50 years they started to fail and collapse and required replacement. (Reproduced Record at 548a.) A manhole was now used as replacement. "I mean, you can't maintain a system with equipment with a lamphole. You got to have a manhole because to maintain and operate, you've got to be able to get in there from the bottom and get in from the top in an emergency situation because you really don't know what it is. You're going to need that access." (Reproduced Record at 561a.) He described two instances where the vitrified clay became brittle and failed and had to be replaced with a manhole—

Elmdale in McLaughlin Run and Clifton Road in Piney Fork Creek. Regarding Clifton Road, he specified that the creek migrated and had washed out all of the backfill and cover from large sections of the pipe so you could actually stick your hand in and feel the pipe which was considered very serious because sewage would either be going into the creek or the creek would be going into the line. (Reproduced Record at 563a.) It had to be repaired. Finally, Smith stated that they performed raise and re-grade projects (5.80%) which consisted of raising manholes that had been buried below the surface by residential development.

The Bureau presented the testimony of its Director, A. Robert Risaliti (Risaliti) who stated that in the Bureau's opinion, the repair and services associated with sanitary sewer, storm sewers and manholes was non-maintenance. He stated that any time the work changed the size, type or extent of the sewer pipe, it was considered reconstruction. Risaliti also stated that the only time an emergency would affect prevailing wages was if the governor declared a state of emergency and signed a proclamation form. He denied that the Bureau looked at ratios or percentages of non-maintenance work to maintenance work to determine whether prevailing wages applied. He also stated that there was no way to simply repair a sewer line and have it maintained without changing the size, type or extent of the sewer line. "Repair is repair." (Reproduced Record at 633a.) Risaliti admitted that no one from his department ever visited any of the work sites in the municipality.

The Board found that most of the work performed under the contract was for maintenance work, but because the work was aggregated into one contract and bundled together with work that was not maintenance work, the whole contract was subject to the Prevailing Wage Act. The work that it specifically found not to be maintenance work was manhole-to-manhole replacement of pipe (5.80% of the total projects) and the replacement of lampholes with manholes (17.39% of the total projects). The Board determined that less than 25% of the total projects performed were not maintenance work, but the type of repair that was public work, and even though they fell below the $25,000 threshold, were subject to prevailing wages because they were part of the aggregated contract. With regard to those projects, the Board made the following findings:

16. Manhole-to-manhole replacement projects involve replacing an entire section of pipe between two manholes, and require the same basic steps as for spot replacements. This approach was taken only where the pipe between two manholes was generally in poor condition and there was no good pipe to which the new pipe could be connected. Manhole-to-manhole replacement projects varied in length from 66 to 243 lineal feet. (N.T., pp. 35–39, 80–84; Grievant Ex. 3).

17. A lamphole-to-manhole replacement involves replacing a broke lamphole with a manhole. A lamphole is a six to eight inch diameter pipe that goes from the sewer pipe up to the surface, with a cover on the end that can be removed so a worker could shine a light down into the sewer to check for problems. A manhole is necessary to access and maintain the system so whenever a lamphole is broken, it is replaced with a manhole. A lamphole-to-manhole replacement involves clearing the surface of trees, bushes, or pavement; excavating a hole that is ten feet in diameter; setting a pre-cast concrete reinforced manhole; tying it to the existing pipe; backfilling with limestone; connecting a steel frame and lid that attaches to the

pre-cast concrete; and restoring the surface with grass, bushes, or pavement. (N.T., pp. 27–28, 40–42, 84–85).

■ The Board then denied the grievance, and Bethel Park filed this appeal.[3]

■ Even though the work was paid for under one contract, Bethel Park contends that the Board erred in finding that the work was public work subject to prevailing wages and not maintenance work because it was normal maintenance work not involving replacement or repairs to the sewer system. It also argues that even if some of the work performed under the contract was not maintenance work, it does not mean that all the maintenance work was somehow subject to payment of prevailing wages.

The contract at issue here required the contractor to respond to requests within 24 hours, no specific amount of work was guaranteed, payment was based on labor and material, and the work was necessitated by conditions that required immediate action. While payment was based on labor and material, no work under the contract was planned but performed on a specific work order for a specific job to correct a sewer or a component of a sewer that had failed or was in danger or imminent danger of failing. As long as the work was "the repair of existing facilities, that is, facilities that, at some point, were operating properly but have now failed to do so," then the work was "maintenance work." This is so even if some work was later found to be "public work" because each work order was separate and discrete and made "maintenance work" performed under the contract subject to payment of the prevailing wages. Because, in this case, the Board found that approximately 75% of the projects completed under this contract were for "maintenance work," it improperly found that all work was subject to payment of prevailing wages.

■ The Board did find that two types of work were not maintenance work—the manhole-to-manhole pipe replacement and broken lamphole replacement with manholes. In the case of manhole-to-manhole replacement projects (5.80% of the total projects), there was substantial blockage in the sewer line caused by a crushed pipe and there was no good pipe to which the new pipe could be connected, necessitating that all the pipes in the manhole-to-manhole had to be replaced. The replacement of old clay pipe with PVC pipe did not change the size, type or extent of the sewer line, and because clay pipe is no longer used, PVC pipe is its functional equivalent. Because the manhole-to-manhole replacements were done to allow the failed sewer to operate properly, the Board erroneously found that the manhole-to-manhole replacement of pipe was not maintenance work.

■ As to the other type of work, lamphole-to-manhole replacement (17.39% of the total projects), the Board argues that because broken lampholes were replaced by manholes, that takes it outside of maintenance work because manholes are bigger and allow access to the sewer while lampholes only provide a view of the sewer. We agree. Smith's testimony was that lampholes were only six or eight inches in diameter while manholes were four or five feet in diameter. The lampholes were being replaced with manholes so that workers could actually get into the sewer in an emergency. That was not the intent of using lampholes in the 1950s. Then the intent was to merely look down into the

3. Our scope of review of the Board's decision is limited to determining whether constitutional rights were violated, an error of law was committed, and whether necessary findings of fact are supported by substantial evidence. *Borough of Ebensburg v. Prevailing Wage Appeals Board*, 893 A.2d 181 (Pa. Cmwlth.2006).

sewer, not to go inside of it. Now, using a manhole cover, it is a change in the system and not merely maintenance work because a worker can go into the sewer system. Because the type or extent of such facilities was changed or increased, lamphole replacement was not maintenance work, and the Board properly determined that work was subject to the Prevailing Wage Act.

Accordingly, the order of the Pennsylvania Prevailing Wage Appeals Board, dated January 26, 2009, is affirmed to the extent it ordered prevailing wages be paid only on the work performed on the lamphole-to-manhole repairs. In all other respects, the Board's order is reversed.

Judge BUTLER dissents.

***ORDER***

AND NOW, this *18th* day of *November,* 2009, the order of the Pennsylvania Prevailing Wage Appeals Board, dated January 26, 2009, is affirmed to the extent it ordered prevailing wages be paid only on the work performed on the lamphole-to-manhole repairs. In all other respects, the Board's order is reversed.